First case we're going to hear this morning is Rice v. Adams and Mr. Eric Karpinski. We'll hear from you. Good morning, Your Honors. May it please the Court. John Karpinski on behalf of the Appellant Defendant Correctional Officers. This case is grounded in the medical treatment that Ms. Rice received during her nearly 13 hours of incarceration at the Cecil County Detention Center. During this brief time, Ms. Rice was seen by qualified health care professionals, which are employed by a third-party medical provider, Prime Care, Inc., three separate times. Through these visits, the medical staff evaluated Ms. Rice and prescribed a course of treatment. Those folks are not part of this appeal, right? Correct, Your Honor. Just the sheriff and the sheriff's employees? That's correct. They are part of the case below, but they are not part of this appeal. Your Honors, we submit that the district court erred in denying the correctional officer appellant's qualified immunity. The court first erred in defining the constitutional right as Ms. Rice's, quote, right to medical treatment for her serious medical conditions. And the court also erred in finding that plaintiff appellee plausibly pleaded a constitutional violation against any of the 16 named correctional officers. Let me ask you how this would work. This is a 12B6, so we're just looking. I know you filed a motion to dismiss or for summary judgment. The court chose to follow the 12B6 course. How do we handle qualified immunity on a 12B6? Well, Your Honor, the steps for qualified immunity, is there a clearly established right? I understand, but it's an affirmative defense, right? Correct. And so, do we look at the complaint to see whether the defense is precluded, number one? And number two, does the plaintiff have to plead in a fashion that anticipates defenses? Well, Your Honor, certainly I think looking to the 12B6 standard under Iqbal Twombly is helpful, although not dispositive in the qualified immunity inquiry at this stage. I think, yes, I think if qualified immunity is, you know, on the face of the complaint, if the correctional officer defendants are entitled to qualified immunity, then this court can grant it at the 12B6 stage. So I suppose the answer to your question, Your Honor, is yes. So continue and take me through how we would look at this complaint. Now, let me grant you something about this complaint. This complaint alleges a generalized constitutional violation, but it attributes it to no one. There is no person who has attributed any given fact in the complaint. It just says this was a person, this was a person there. So there's a problem there in that regard. That's more of a 12B6 failure to state a claim maybe. But maybe it can be cured by amendment. I don't know. But on qualified immunity, go ahead and take me through what we would look at. Well, I think, Your Honor, you would. As you're starting to do that, your argument is only on qualified immunity? It's not that the complaint is deficient and fails to state a claim? Well, I think to Judge Niemeyer's question, the two are interrelated in the sense that it's deficient. I certainly believe it is deficient under 12B6, but I don't believe I can challenge that on an interlocutory appeal, Your Honor. I have to take it. If I'm going to take an interlocutory appeal, I have to take an interlocutory appeal on qualified immunity, which we did. But on the first prong of qualified immunity, they have to allege a constitutional violation. And so, Judge Niemeyer, to your question, to allege a 1983 violation, you have to prove, ultimately, facts against each individual defendant of personal actions that they took. And as Your Honor recognized, there's not an action that any of these 16 correctional officers took that's pleaded in the complaint. So when looking to whether they're- There's no action attributed to them. I mean, they basically say the complaint alleges a form of two sentences with respect to each law enforcement officer that's identical. They're all just listed identically. What's it, 16 of them? Correct. Plus a sheriff. And so we can't attribute, but I'm just asking procedurally how we go about this, if you're right. I mean, do they have to- The district court said they alleged an Eighth Amendment or a Due Process Clause violation, wherever you place that.  But the next step is, do they attribute it to any of the officers? Maybe some of those officers were simply a guard at the front gate. I mean, you know, we don't know. Correct, Your Honor. In fact, we don't even know if these officers worked for one single second of the 13 hours that Ms. Rice was incarcerated. Fair enough. We simply don't know. That's a 12B6, right? We don't know. But to the first part of qualified immunity, have they alleged a constitutional violation? Can I go back to that question? You're not conceding that that's limited to 12B6 Fair to State of Claim, right? To get past qualified immunity, we've said in cases like Langford that you have to identify the act of a given person that passes both steps of qualified immunity. So that's not just a Fair to State of Claim. That same defect that Judge Niemeyer has identified also makes it apparent on the face of the complaint that they don't survive a motion to dismiss on qualified immunity, right? Correct, Your Honor. And I think, I know Your Honor sat on the panel in the Langford case. I think that that case is absolutely identical to this. It was a medical indifference case. They pleaded it against five correctional officers and several medical. So to follow up, Judge Richardson, in your view, Langford resolves this case? Well, I think it resolves the part one step of the qualified immunity analysis, which is have they alleged a constitutional violation? And I think under Langford, the answer is clearly no, they have not. As to the 16 named correctional officers. So do we just stop there then, in your view? Certainly you could, Your Honor. I think that, and I think that is the path of least resistance to this court resolving this appeal, would simply to say they haven't alleged a constitutional violation against any of the correctional officers. So if we reverse on that basis, I mean, why would we need to say anything else? You wouldn't, Your Honor. I agree that you wouldn't. That would be dispositive of qualified immunity for the correctional officers. So you wouldn't have to reach the clearly established right prong. Can you go back to Judge Niemeyer's question? The question he raised I thought was a good one, and I'm curious your take on it. And that is, because qualified immunity is an affirmative defense, it's not natural to think that we look at the complaint to identify it. And yet, obviously in cases like Lankford and a host of others, we do look at qualified immunity at a motion to dismiss. But we do so looking at whether it is apparent from the face of the complaint. Can you help us understand sort of why that's the right way to think about an affirmative defense like qualified immunity? Yes, Your Honor. This court and the Supreme Court have made clear that qualified immunity questions should be resolved at the earliest possible phase in litigation. So it certainly is not the case that you can't, you know, grant qualified immunity at the motion to dismiss stage. As Judge Richardson said, this court has done it many times before. And the reason that it is important to resolve qualified immunity at the earliest possible stage, as this court has said, you know, it's not just an affirmative defense to liability. It also is supposed to prevent government officials from having to incur burdensome discovery, which would affect the orderly operations of government. So, Judge Richardson, my response would be it should be resolved at the earliest possible stage, which is, you know, the motion to dismiss is generally the earliest possible. That sort of seems maybe it's just the nature of it. It puts plaintiffs in a little bit of a tough spot, right? Because on the one hand, the more information they plead to get past a fair to state a claim argument, the more likely it becomes apparent on the face in a sufficient manner that the court can address qualified immunity to 12b-6. And so maybe that's just a difficulty that plaintiffs face. Is that fair? Well, I think so, Your Honor. But I also think it helps to filter out cases where there's going to be no finding of liability at all in the case ultimately. So it certainly puts, you know, it's a burden on plaintiffs, I agree. But at the same time, it also is going to filter out cases that don't have sufficient chance of finding of liability against the government officials. What if the plaintiffs come and argue that they want to amend their complaint? What should our response be? Well, Your Honor, I think amendment at this stage, temporally, would be very prejudicial to the correctional officers. This is a 2020 incident. The statute of limitations has long run on this case. Plaintiffs filed within five days of the three-year statute of limitations period. So they had plenty of time to conduct an investigation into this incident. Judge Richardson, as was discussed in Langford, you know, it's not impossible for plaintiffs to get this information. Do you think we should address that question as an initial matter, or if we were to send this back as the question of amendment, something that the district court would be called to take up on its own as an initial matter? Frankly, Your Honor, I think the district court could handle it as an initial matter, and we could litigate it under Rule 15 below, whether they should have the right to amend their complaint, given the amount of, you know, what the prejudice is. If the court wants to find that it's overly prejudicial, I certainly would welcome it, but I think it could be litigated. Not to do, given there's no briefing at all on that, right? Correct. I think it's more properly for the district court to decide in the first instance under a Rule 15 motion. Well, the plaintiff hasn't requested it either. Has not requested it and didn't request it, you know, hasn't requested it at any time below. All right. We'll hear from Mr. McDonnell, unless you have any further. I didn't mean to preempt your last six minutes. I think I'm reading the tea leaves, sort of, but if I could just make a quick argument on the clearly established right prong, Your Honor. The clearly established right that the district court found in this case was Ms. Rice's right to medical care for serious medical need. Obviously, correctional officers are not charged with providing medical care, especially when the decedent was under medical care by third-party medical professionals. So we believe that that formulation of the right is wholly inapplicable and sort of inappropriate, given the difference between correctional officers and medical personnel. So with that, I will reserve my time for rebuttal. All right. Mr. McDonnell. Good morning, Your Honors. May it please the Court, Randy McDonnell on behalf of plaintiffs at Pele in this matter. Your Honor, the trial court 100 percent decided this matter correctly. The trial court walked us right through its reasoning on why. The trial court walked us right through in its order on why it was ruling that the correctional officers were not entitled to qualified immunity in its order. It talked about Ms. Rice's opioid withdrawal that she would face. It talked about how each correctional officer was on notice of that. At this stage. Why is this case different from Lankford? Sure. For a couple reasons, this case is different from Lankford. One, Lankford was the person he acted pro se. He was the person at any time throughout the litigation could have pointed to the individuals who had denied him his rights. Ms. Rice is not here to do that. That's why we need the discovery process to work us through that. Also, if you look at Lankford, when it talks about what's needed in the complaint, it does talk about how it puts plaintiff at some disadvantage. And only that that ruling was applicable to the Lankford case on the facts of the Lankford case. And in another case, it may be appropriate for the court to conduct some discovery. Well, if we pick, I mean, just pick any of the sheriff's deputies or employees at random. I'm looking at page 23 of the appendix, Kisner, Chestnut, Kennedy. How do they know from this pleading what it is they're accused of doing, how they did it, where they did it, when they did it? So the complaint accuses them of having heard Ms. Rice screaming and writhing in pain and yelling at her to shut up. Yes, Your Honor. That's what the complaint alleges. Can you go to that section? That's paragraph 75. And that's where it actually doesn't say that at all. So let's start with the first sentence where it says that throughout the morning she was screaming and writhing in pain. It doesn't say that anybody heard her. What's the factual basis for that? Like, this is one of the oddities here is that your client is not alive. Sure. That's obviously a great tragedy. But that doesn't attribute it to any given officer. And I'm sort of curious what the factual basis for that is, in part because I'm most curious about what the factual basis for the next sentence is. Sure. Which is the custody staff unidentified. That doesn't even identify that it was a defendant. That just says somebody in the custody staff, not even a defendant, told her to shut up. And I guess what I'm most curious about is what is the good faith factual basis that you have for making that allegation? Because if you have a basis for it, then it must be attributed to somebody. Sure. And the fact that you didn't attribute it to a defendant suggests to me that this is a misleading statement. Your Honor, I assure you it is not misleading. So what's the factual basis for a correctional officer telling her to shut up? We have had conversations with her cellmate. Her cellmate indicates that there were people throughout the night yelling to her to shut up when she was screaming. You didn't say any of that. I understand that, Your Honor. But it is odd, then, to not identify it as a defendant. It's sort of generic. It doesn't say this is like a defendant said this or the defendants said this. It sort of specifically just refers to custody staff in general, like lower case, not referring to a particular person. That seems like precisely the point of Lankford. You don't get to just say, yeah, somebody. And I know it's hard, particularly in your scenario because Mrs. Rice is no longer with us. I get it's really hard. I'm not disparaging that point that comes through in Lankford. But, you know, really hard is sometimes what you get. No, no, Your Honor, I do understand. I'm not sure that I'm quite understanding the question that's on the table right now. The question is how you said that the defendants heard her screaming and writhing in pain. And I want you to tell me why, based on this paragraph, I actually have any reason to believe like that. That they heard her? These defendants. Not that somebody. Sure. Right? The cellmate may well have heard her. Right. I mean, I know that may be based on your representation, but I certainly don't know that from the complaint. And I don't know that any of the defendants heard her or any of the defendants told her to shut up or any of the defendants had anything to do with it. That's the rub I'm having, which I think was getting at the point that Judge Agee was trying to get you to answer. So we know that they heard her screaming and writhing in pain. The reason why you know that is because they responded by telling her to shut up. And who's they and your sons? I'm sorry, the custody staff, Your Honor. Sixteen of them came down? And I would admit to you that we, at this point, do not know exactly which ones. And what constitutional violation is it when they come up and tell her to shut up? So that's ignoring her medical emergency at the time. She's having a medical emergency at the time. What if they made a judgment that she was just screaming at them? Maybe her cellmate was kicking her. But that we don't know right now, and we have to rely on the facts. No, but I'm saying the question is, you don't know it now, but the whole question is whether the officers are immune from the conduct that you're alleging. And the conduct you're alleging is very difficult to discern. And at that point, we not only have to identify a constitutional violation, but then we have to identify that the violation was one of which a reasonable officer in that officer's position would have clearly understood. And it seems to me this pleading doesn't impute anything that I can see to any given officer. But it does impute it to all of the officers, Your Honor. Wait, why is that? Tell me why. I mean, does paragraph 75 even say that all of the officers heard her and all of the officers told her to shut up? It does say the individual custody staff. I'm sorry, the custody staff at CCDC told her to shut up. It does say that. You suggest that that reads that every single member of the staff, which I presume includes the sheriff, told her to shut up. Because that's wholly implausible, right? Like, there's no world in which that occurred. It's not implausible, Your Honor. It depends on the number of times she screamed, how little she screamed. I believe that the sheriff was in the jail on the early morning hours of August the 29th. Well, that we don't know at this point, Your Honor. Do you allege it? That the individual sheriff, we do not allege that in this particular complaint, Your Honor. But nonetheless, Your Honor, the trial court, in its well-thought-out order, laid out why it was making the decision that it made. It laid out that the officers did not have qualified immunity. It laid out the serious medical condition. What do you understand the district court have said why the officers don't have immunity? Yes, because as the district court walked us through it. I thought the district court made one sentence in a footnote, and that was it. No. Did it go further? Yes. Okay. So looking at joint appendix, page 130. When it talks about while in custody, Ms. Rice suffered opioid withdrawal, a medical condition that posed substantial risk of serious harm. She further alleges that Ms. Rice was booked at CCDC. While in custody, you allege that the nurses or the care people were in charge of her medical attention, right? So at the time she's screaming and writhing in pain, Your Honor, my understanding is that she's in a booking cell, not in the detox cell that she was supposed to be put into. So in the booking cell, at most facilities, there's not going to be a nurse in that cell. Most likely in the booking cell, there were custody staff at the booking cell, but not any medical staff. You're asking us to infer all of this, because none of that's pleaded. I understand, but I do think that complaints. But I don't see the district court addressing the qualified immunity there on page 130. So the district court does address it in the footnote. Well, all it says is that Ms. Rice had a clearly established right to medical treatment. How does that tie back to any of these defendants? Right. The individual defendants, Your Honor, it does not necessarily tie back to them, other than the fact that the district court indicated that the complaint states that it was the custody staff that hurt her. They're the defendants. We're not talking about the medical staff. We're talking about the deputies. Right. I'm sort of at a loss as to how that one sentence has a nexus to any one of the defendants that you've got in this case. Right. So that footnote is footnoted to the paragraph. In the paragraph, the district court lays out its opinion about the plaintiff alleges that each individual custody defendant was made aware of Ms. Rice's condition. By observing it themselves, by being informed of her condition by other detainees in the facility, and by being informed by other employees and personnel of prime care and CCDC. Thus, Ms. Rice's condition was known or should have been known to each individual custody defendant. What is it that you think that's imagined that there is such a defendant who had that information and heard her screaming and writhing in the early morning of August the 29th? What is the action that you allege or even didn't allege but now want to articulate that that officer should have taken? What should he have done? At a minimum, I think the officer should have checked on her to see what her condition was at the time. Called a nurse, checked on her condition. Checked on her condition and called a nurse. Maybe called 911, depending on what it is that the officer saw. We know the nurse was there. We're talking about the early morning hours of the 29th. We know the nurse was there four different times, right? Yes. So the point you're making is that it is patently unreasonable to have gotten a nurse there four times over the course of what looks like seven hours. Right? So four times in seven hours. Like you're saying it's like deliberate indifference to have not gotten the nurse there a fifth time? It's deliberate indifference to hear her scream, to hear her writhe in pain and tell her to shut up. And then at that time not call a nurse. That's the deliberate indifference. I thought the nurses came. You alleged that, right? At some point the nurses do come. I think that... Is there an allegation that the custody staff heard her before the nurses were there? So we don't know exactly which order it occurred in, Your Honor. It's sort of important. In other words, you're alleging that some custody guy heard her screaming, even though the nurses were there, and had to call another nurse or call a nurse again. And the question I would have is what case do you say that that violates the Constitution? So, Your Honor, she's in a booking cell. So she's not in a place where a most likely... I understand she's in a booking. You already said that. But you've conceded that the nurses were attending the decedent multiple times that morning. And my question is what case do you have where nurses are attending the prisoner and the officer is held to violate the Constitution because he didn't call again or didn't take different action? Sure. There's not a case exactly on point there. But I think for the court to accept that analysis accepts a lot of the factual allegations made by the defendants. The defendants are saying that there was a qualified medical provider there. That's not something that's within the complaint. And we have to take the complaint on the four corners of the complaint. The complaint doesn't allege that the nurse was there at 240, at 852, 859, and 943, and 952? It certainly does do that, Your Honor. Right. I mean, I don't know. You can disparage the defense, but that's in the complaint. Right. Is the allegation that the nurse was not a nurse? No, no, no. You didn't allege that there was a qualified medical provider that was there. I mean, I totally acknowledge. It's got to be apparent from the face of the complaint. If you didn't include that information in the complaint, then I get it. It'd be hard. This is back to Judge Niemeyer's point. But, like, you allege that the nurse was there four times over the course of the morning of the 20th. So I'm not saying that the nurse was or was not qualified. What I'm saying is that nowhere in the complaint is she called a qualified person. She's called a nurse. Right? I understand that she's a nurse, Your Honor. I'm not going to go as far as to call her qualified. That is something that the defendant— You think the guard is more medically qualified than the nurse, that the guard should have questioned the nurse, right? So, like, you're a nurse, but you probably don't know enough about medicine. I'm a guard, so maybe I should weigh in to that. I think there are situations where a guard, a correctional officer, will have to do such things. It might be situations. But when you've got a nurse there four times for opioid withdrawal, really? Perhaps, Your Honor. Yes, absolutely. For opioid withdrawal. Opioid withdrawal can be a violent reaction to lack of having an opioid in your system. Absolutely. Yes. Yeah, but we're trying to find out what's unconstitutional conduct on the behalf of a deputy sheriff. And you're arguing that the nurses are there attending her, coming there multiple times, and that an officer, the officers, told her to shut up. Now, we asked what should the officers have done, although it's not alleged, and you said they should have called the nurse or they should have called 911. That's what you just said. The question is, isn't that, does an officer have to default and say the nurses are incompetent or the nurses aren't doing their job? Is that something that is imposed on the sheriff by the Constitution? Your Honor, it can be. It certainly can be, depending on the situation. Well, what's your case? Give me one case that you're relying on that the custody guys should have known about. That tells them they should have overrid the nurses. So I believe that maybe ICO stands for that proposition, that you can override a decision, or not such that you can override the decision, but you're here for your own constitutional violation. And certainly telling Ms. Rice to shut up while she's writhing in pain. The case tells a sheriff, a deputy, that he has a duty to take charge when the nurses are there. Just a case that said that it was unconstitutional for the sheriff to have not taken over. Sure. So depending on the factual situation, Your Honor, I think when you reframe the facts that way, I don't think that there is a case that says that. But I don't think that that's the facts that we have here. So the facts that we have here is that while she's screaming in pain, while she's taken instead of to a detox cell and placed in a booking cell, that she's screaming in pain. And the facts that we have here is that she's told to shut up. That she's not given nursing care at that time. So that was unconstitutional conduct, even though she's receiving medicine, she's being attended by the nurses, and a sheriff is behind her while she's screaming because she's in pain, even though she's being given medicine for that. So the sheriff is now acting unconstitutionally? I think that reads a lot of facts into the case that are not within the complaint, Your Honor. I thought we were reciting the facts of the complaint. So I don't believe that the complaint says anything about a nurse being present while she's screaming in pain. Let me ask you, just so I'm clear. The district court's opinion in this case came a year and a half after the decision in Lankford. Maybe this wasn't raised below, but I don't see that the district court ever addressed that case. Did it? Was it discussed at all? I don't recall it being discussed, Your Honor, at all at that trial. So the only point, Your Honor, I would remain is that the district court decided this case absolutely correctly. I would ask the court to affirm the district court's opinion. All right, thank you, Mr. McDonough. All right, Mr. Kopinski, you have a little bit of time. Thank you, Your Honors. I want to pick up on Judge Niemeyer's question. Is there a case that stands for the proposition that there's a constitutional violation when somebody has seen medical attention, is receiving medical attention, and, you know, the inmate is screaming in pain? And I think Lankford is the exact case we're looking for. I mean, that is the exact factual situation that occurred in Lankford. He was sent to outside medical. He came back, and, you know, he continued to complain, and the question was did he complain that his symptoms were worsening? Ultimately, the court found there was no constitutional violation in Lankford. So I would respectfully submit, Judge Niemeyer, the case you're looking for is Lankford v. Joyner, and it clearly says that there was not a constitutional violation. And I just wanted to point to there was a lot of discussion regarding joint appendix in the complaint, paragraph 75, which is the shut up. I wanted to direct the court to paragraph 9, which comes in the introduction, and I'm going to quote, despite their knowledge of her condition and Ms. Rice's wailing and pain throughout the night, medical and custody staff did not act to assist Ms. Rice and told her to shut up while she winced in pain. So that allegation actually attributes the act of saying shut up to both the medical and the correctional staff without attributing it to anybody. So if your honors don't have any questions, I'm happy to stand on my papers. All right, we'll come down and greet counsel as is our custom and then proceed on to the next case.
judges: Paul V. Niemeyer, G. Steven Agee, Julius N. Richardson